# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

TAYJHA ALFRED                    CASE NO.  6:24-CV-00274

VERSUS                           JUDGE DAVID C. JOSEPH

BO DUHE ET AL                    MAGISTRATE JUDGE CAROL B. WHITEHURST

## REPORT AND RECOMMENDATION

Before the Court is the Motion to Dismiss filed by Defendants, M. Bofill Duhe, individually, and officially as the District Attorney for the Louisiana 16th Judicial District ("DA Duhe"), and Assistant District Attorney for the 16th Judicial District, Alister Charrier ("ADA Charrier"), individually. (Rec. Doc. 28). Plaintiff, Tayjha Alfred, opposed the motion (Rec. Doc. 30), and Defendants replied (Rec. Doc. 38). The motion was referred to the undersigned magistrate judge for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of this Court. The Court held oral argument on August 23, 2024. Considering the evidence, the law, and the arguments of the parties, and for the reasons explained below, the Court recommends that Defendants' motion be denied.

# **Introduction**

Louisiana's material witness statute, La. R.S. 15:257, authorizes a judge to issue an arrest warrant for a witness essential to the prosecution in a criminal proceeding, if it becomes impractical to secure the witness's presence by subpoena. Under the statute, the witness so arrested must be held in the parish jail, or other suitable place, until he provides an appearance bond, or until he testifies at the trial.

Garon Lewis was murdered in August 2019. Tayjha Alfred alleges that, though she had picked up and later dropped off a friend near the scene of the murder, she did not witness the murder and had little knowledge of it. She voluntarily gave police interviews shortly thereafter. Nevertheless, three years later, the District Attorney had her arrested as a material witness, despite having attempted only twice to serve her with a subpoena for the murder suspect's trial, and despite knowledge that she had been working out of state as a traveling nurse. Alfred remained in the Iberia Parish jail for six months—without appointed counsel, without the chance to post bond, and without any communication from the District Attorney—until the murder trial, when she testified for thirty minutes and was then released. In the meantime, she lost her job and her position in a nursing degree program.

Alfred's suit challenges the constitutionality of the material witness statute[1] and seeks damages from the District Attorney who allegedly wielded it to destroy her life. Defendants, DA Duhe and ADA Charrier, move to dismiss the case primarily on the grounds of immunity. Relying on nuances and distinctions in a field of, at times, unsettled law, Alfred urges the Court to find that her allegations are sufficient to survive.

### Facts and Procedural History

Alfred filed this suit for alleged constitutional violations against DA Duhe and ADA Charrier after being incarcerated for six months under Louisiana's material witness statute. She alleges that in August 2019, she picked up her friend from a home in Iberia Parish, drove him to complete an errand and, when she returned to drop her friend off, found yellow tape and flashing police lights in the area. (Rec. Doc. 6, ¶48-51).[2] Unbeknownst to her, Garon Lewis had been murdered

---

[1]   The constitutionality of La. R.S. 15:257 is not at issue in this motion. The Court makes no findings in this regard.

[2]   Alfred filed her original complaint on February 23, 2024 (Rec. Doc. 1) and filed a First Amended Complaint on April 16, 2024 (Rec. Doc. 6) before Defendants answered. Whether viewed through the lens of F.R.C.P. Rule 12(b)(6) or Rule 12(b)(1), the court's review is limited to complaint's allegations, any exhibits attached thereto, and documents attached to the defendant's motion which are referenced in the complaint and central to the plaintiff's claims. *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir. 2007). The court is also permitted to take judicial notice of public records as well as facts which are not subject to reasonable dispute in that they are either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *Funk v. Stryker Corp.,* 631 F.3d 777, 783 (5th Cir. 2011).

in the area while she and her friend had been on their errand. She did not witness the shooting. (¶52; 54). A few days later, police officers went to Alfred's home. Though she was not home at the time, she later voluntarily went to the police department and provided two interviews, stating that she was not present at the time of the crime and had limited knowledge. (¶55-65).

In the following three years, Alfred alleges she became a certified nursing assistant (CNA). She worked as a nurse in Iberia Parish until the Covid-19 pandemic when she began working as a traveling nurse, working in nursing homes in various states through February 2023. During breaks, she regularly returned to her mother's house in Iberia Parish, which she considered her home. She worked as a traveling nurse through February 2023, and anticipated beginning a Licensed Practical Nursing program in August 2023. (¶66-77).

Meanwhile, in May 2022, Defendants charged Bryson JohnLewis and Travis Layne with Garon Lewis's 2019 murder. (¶78). According to Alfred's complaint, the victim's father, Raymond Lewis, was a prominent member of the community and activist and pressured Defendants to do more in their prosecution. Alfred alleges that in October or November 2022, Raymond Lewis created handmade "Wanted" posters advertising a cash reward for anyone who provided information about Alfred and two other witnesses' whereabouts. (¶80-85; photograph of poster at page 12).

4

In October 2022, Defendants requested issuance of a subpoena for Alfred and other witnesses to testify at the JohnLewis trial. Alfred alleges that Defendants attempted to serve her only twice with a trial subpoena before having her arrested as a material witness. Alfred alleges Defendants first attempted service at an address where she had never lived, with the service return indicating as much. Defendants next attempted to serve Alfred on October 6, 2022, at her mother's home. Her mother told the serving agent that Alfred was working out of state as a traveling nurse at the time. Alfred alleges that Defendants did not attempt domiciliary service or ask her mother when she would return home on a break. Instead, a few weeks later, in late October 2022, police surrounded her mother's home, pounded on the front door, and demanded to speak with Alfred. Her mother again advised that Alfred was working out of state as a traveling nurse. (¶86-98). Alfred alleges that Defendants did not attempt to serve Alfred with a subpoena out of state, despite their knowledge that she was working as a traveling nurse in Indiana at the time, and that Defendants never communicated with Alfred via phone, voicemail, text message, email, or social media that she was to testify at the JohnLewis trial or that they were trying to subpoena her. (¶98-99).

On November 7, 2022, Defendants filed an ex parte *Motion for Arrest of Material Witness Pursuant to R.S. 15:257* in the JohnLewis criminal case. In the motion, ADA Charrier stated that the first service return "came back as – does not

reside there." (Rec. Doc. 6, ¶102-125; Rec. Doc. 6-1, p. 2). The motion further stated:

> There was no service return for 4405 Old Jeanerette Rd. Lot 40 in New Iberia. Contact was made with her mother who indicated that she in [sic] a traveling nurse in New York but gave no other information to us regarding a good contact. The district attorney's office had previously made contact with Tayjha Alfred via phone in which she confirmed an appointment date and time with our office for September 2, 2022 in which she did not show for said appointment. Tayjha Alfred has previously provided statements to the New Iberia Police Department.

(Rec. Doc. 6-1, p. 2).

Alfred alleges that Defendants' assertions regarding the September 2, 2022 meeting were false and that Defendants had not spoken to her about a meeting. She alleges that the assertion was "held over" from another material-witness arrest motion in the same case pertaining to a different witness. (Rec. Doc. 6, ¶116-20).

On November 7, 2022, the same day ADA Charrier filed the motion for Alfred's arrest, District Judge Hamilton signed a blank order and handwrote what appears to be the following: "Tayjha Alfred be arrested and incarcerated until she be given appropriate appearance." (Rec. Doc. 6-1).  Alfred alleges that, thereafter, in January 2023, police surrounded her mother's home at 3:00 a.m. looking for Alfred. Her mother told the police again that she was working out of state. (¶126-28).

Alfred finished working in Indiana in early February 2023, and returned to Iberia Parish until her next post, scheduled for Montana in March 2023. She spent

weeks in Iberia Parish without being served a subpoena or contacted by Defendants. On February 24, 2023, she was arrested as she was leaving the grocery store and booked into the Iberia Parish Jail for a material-witness hold. (¶129-39).

On February 27, 2023, Alfred appeared before Judge Hamilton for a 72-hour hearing, where she was informed that she was being held as a material witness. She alleges that she was not given the opportunities to have appointed counsel, to test or review the government's evidence, to present her own evidence, to post bail, or to even speak. (¶140-52). Judge Hamilton ordered that Alfred "be held without bond until the district attorney can speak to her and notify the court what arrangement has been made." (Rec. Doc. 6-2).

Alfred alleges that she was thereafter held as a material witness until JohnLewis's trial, which did not occur until September 2023. Alfred alleges that, during that time, Defendants never attempted to visit or contact her to interview her or to make any arrangement to secure her testimony. (¶153-57). During the six months that she remained in jail, she and her mother attempted to obtain an attorney and to secure her release, to no avail. She filed three *pro se* motions attempting to be released on bail and/or house arrest. Somehow, her first motion was never filed. Though Defendants did not file an opposition to her second motion, the judge summarily denied it. (¶169-89). In response to her third *pro se* motion, filed June 5,

2023, which Defendants again did not oppose, Judge Thibodeaux, to whom the criminal case had been transferred, set a hearing for September 6, 2023. (¶190-224).

By the time of the September 6, 2023 hearing, Alfred had obtained counsel, Chloe Chetta. Ms. Chetta advised that she would accept trial subpoenas on Alfred's behalf, would coordinate meetings with the district attorney's office, and would ensure Alfred's presence. (Rec. Doc. 28-2, p. 3-4). ADA Charrier stated that 1) the District Attorney had attempted service unsuccessfully at Alfred's two last known addresses; 2) Alfred did not show up for an appointment on September 2, 2022; 3) ADA Charrier had met with Alfred's mother in December 2022, explained the material witness warrant, and encouraged her to get Alfred to meet with her (Charrier); 4) while Alfred was in Indiana, the District Attorney had been in contact with the Indiana District Attorney's Office and was working with the warrant task force to locate Alfred; 5) Garon Lewis's father, who was present at Alfred's hearing, "adamantly opposed Ms. Alfred's release;" and 6) the District Attorney was opposed to Alfred being released with a GPS ankle monitor or on bond. (p. 5-6; 9-10; 15-16). Judge Thibodeaux denied Alfred's motion and ordered her held until trial, which was scheduled for September 25, 2023. (Rec. Doc. 28-2, p. 16-17). Two days before the trial, the Louisiana Third Circuit Court of Appeal denied her appeal without prejudice to her renewing her application if the trial was delayed. (Rec. Doc. 6, ¶222-23).

After six months of incarceration as a material witness, Alfred testified at the JohnLewis trial for approximately 30 minutes on September 29, 2023, and was released from jail the same day. (Rec. Doc. 6, ¶225-30). While present in the courtroom, Defendants served her with a subpoena to testify at the trial of JohnLewis's co-defendant, Travis Layne.

The subpoenaed dates for the Layne trial were November 21, 2023, and December 11 to 15, 2023. A subsequent subpoena summoned her to appear for trial on December 11, 2023, without reference to the November 21, 2023 date. Alfred called the District Attorney's office and was told she did not need to come until December 11; however, she went to court on November 21 anyway and was turned away by a bailiff who told her she was not needed in court that day. She called the District Attorney's office again that day and was again told she needed only to appear on December 11. Nonetheless, on December 4, 2023, Defendants called Alfred's counsel asserting that she had failed to show up for the pretrial conference on November 21 and asked whether Alfred was "willfully absconding service." Defendants stated that she would be incarcerated if she did not appear on December 11. According to the complaint filed in April 2024, the Layne trial had been re-set for June 2024 (¶231-45) and has since been continued to a date beyond September 2024.

Alfred asserts the following claims pursuant to 42 U.S.C. §1983: violations of federal and Louisiana due process and Fourth and Fourteenth Amendment rights against DA Duhe and ADA Charrier, both individually (Counts I and IV); violations of the federal and Louisiana due process and Fourth and Fourteenth Amendment rights against DA Duhe, officially (Counts II, III, and V); and Louisiana negligent infliction of emotional distress against DA Duhe, individually and officially, and ADA Charrier, individually and officially (Count VI). Although Alfred, an innocent witness with questionable materiality, was incarcerated for six months without even the basic rights given to incarcerated criminal defendants, DA Duhe and ADA Charrier move to dismiss her claims on the grounds of immunity.

## Law and Analysis

### I.    Legal Standards

Alfred brings this claim against DA Duhe, officially and individually, and ADA Charrier, individually, under 42 U.S.C. §1983 for violations of her Fourth and Fourteenth Amendment rights. Defendants rely upon doctrines of immunity to defeat her claims at the outset. In determining immunity, the court must accept the allegations of the plaintiff's complaint as true. *Singleton v. Cannizzaro*, 956 F.3d 773, 779 (5th Cir. 2020). Likewise, in adjudicating Defendants' motion to dismiss under F.R.C.P. Rule 12(b)(6), the court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *In re Katrina Canal*

10

*Breaches Litigation*, 495 F.3d 191, 205 (5ᵗʰ Cir.2007). Conclusory allegations and unwarranted deductions of fact are not accepted as true. *Kaiser Aluminum & Chemical Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5ᵗʰ Cir. 1982); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5ᵗʰ Cir.2000). The law does not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). The allegations must be sufficient "to raise a right to relief above the speculative level," and "the pleading must contain something more …than…a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.* at 555 (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004)).

## II.    Whether Defendants enjoy absolute prosecutorial immunity.

Absolute immunity protects district attorneys sued in their individual capacities.[3] *Singleton,* 956 F.3d at 778, fn. 3. Whether a prosecutor is immune is an inquiry into the function of his challenged conduct. *Wearry v. Foster*, 33 F.4th 260, 265–66 (5th Cir. 2022), *cert. denied,* 143 S. Ct. 2459, 216 L. Ed. 2d 432 (2023),

---

[3]    Defendants assert absolute immunity under both federal and state law. The analysis is the same. *Singleton*, 956 at 779, citing *Knapper v. Connick*, 681 So. 2d 944, 947, 950 (La. 1996).

11

discussing *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984 (1976) and *Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S.Ct. 2606 (1993). The Fifth Circuit explained:

> In discussing absolute immunity, the Supreme Court has made clear that 'it is the interest in protecting the proper functioning of the office, rather than the interest in protecting its occupant, that is of primary importance. Thus, the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor.
>
> Instead, the Supreme Court has taken a "functional approach" to absolute immunity that emphasizes that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question. More specifically, the Court distinguishes between (1) actions taken in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of the prosecutor's role as an advocate for the State, and (2) administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings.

*Singleton v. Cannizzaro*, 956 F.3d at 779–80 (cleaned up), citing seminal Supreme Court jurisprudence, *Burns v. Reed*, 500 U.S. 478, 486, 111 S.Ct. 1934 (1991); *Buckley*, 509 U.S. at 273; and *Kalina v. Fletcher*, 522 U.S. 118, 122, 118 S.Ct. 502 (1997).

More recently, the Fifth Circuit emphasized the distinction between investigatory and advocatory actions:

> The bare labels "advocatory" and "investigatory," however, are of limited utility. A distinction more sensitive to the facts of this case is that between the advocatory function of organizing, evaluating, and presenting evidence, and the separate investigatory function of gathering or acquiring evidence. *See Barbera v. Smith*, 836 F.2d 96, 101 (2d Cir. 1987). "[I]nformation-gathering," this court has recognized, "is more analogous to investigative police work than

12

advocatory conduct." *Singleton*, 956 F.3d at 783. In contrast, evaluating and presenting already-gathered evidence before a judicial tribunal are "quasi-judicial functions" that qualify for absolute immunity. *Id.* at 780. At its core, the advocatory function is one that is "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430, 96 S.Ct. 984. Conduct that is unrelated to the judicial phase of a prosecution, or of only attenuated relation, cannot be said to be advocatory.

*Wearry*, 33 F.4th at 266 (5th Cir. 2022).

The handful of cases throughout the country which have addressed absolute immunity in defense of witness arrest claims illustrates that the question of immunity is, as *Wearry* emphasized, fact sensitive. Alfred relies chiefly upon *Odd v. Malone*, 538 F.3d 202, 214 (3d Cir. 2008) and *Schneyder v. Smith*, 653 F.3d 313, 315 (3d Cir. 2011) in which the Third Circuit denied immunity to prosecutors who failed to reasonably secure material witnesses' releases.

In *Odd*, the Third Circuit considered two cases in which the prosecutors failed to notify the relevant authorities of the continuance and dismissal of the underlying criminal cases for which the plaintiffs had been detained. *Odd*, 538 F.3d 202. In the case of one plaintiff, Schneyder, the warrant-issuing judge had directed the ADA to notify him of any delays in the criminal trial (pending before a different judge), but the ADA failed to notify the judge that the case was continued, and Schneyder remained incarcerated. Rejecting the ADA's characterization of her actions in general terms as an "act of prosecutorial discretion," the court held that the ADA's conduct—failing to notify the court of the criminal case's continuance contrary to

13

the judge's explicit order—was administrative and thus not entitled to immunity. *Id.* at 212-14. That the ADA's failure to act had occurred during a period of judicial inactivity was a significant fact because the ADA's action could no longer be said to be "intimately associated with the judicial phase of litigation." *Id.* at 213-14, citing *Imbler*, 424 U.S. at 430. The court further commented: "We can imagine few circumstances under which we would consider the act of disobeying a court order or directive to be advocative, and we are loath to grant a prosecutor absolute immunity for such disobedience." *Id.* at 214.

Shortly after *Odd*, the Supreme Court in *Van de Kamp v. Goldstein*, 555 U.S. 335, 129 S. Ct. 855 (2009) addressed prosecutorial immunity in the context of administrative actions. The plaintiff in *Van de Kamp*, a wrongfully convicted criminal defendant, argued that the district attorney was liable for failure to train and supervise after a prosecutor used a jailhouse informant known to cut deals with prosecutors without disclosing the impeachment evidence. *Id.* at 339. Although the Court agreed that such claims were based on administrative actions, the Court upheld absolute immunity for the prosecutor, reasoning that the management (i.e. administrative) tasks at issue were "directly connected with the prosecutor's basic trial advocacy duties" as it related to the plaintiff's trial. *Id.* at 346.

Following *Van de Kamp*, the Third Circuit revisited Schneyder's case and affirmed its earlier opinion denying the district attorney immunity. *Schneyder*, 653

14

F.3d 313.   Recognizing that *Van de Kamp* established subcategories within the administrative class of functions, the court held that *Van de Kamp* did not change the characterization of the prosecutor's conduct—the nonperformance of a constitutional duty to advise the court of a significant change in the circumstances surrounding the detention of a material witness—as administrative rather than advocative. *Id*. at 334.

In contrast to *Odd* and *Schneyder*, DA Duhe and ADA Charrier rely on the Fifth Circuit's unpublished opinion in *Doe v. Harris Cnty., Texas*, 751 F. App'x 545, 548 (5th Cir. 2018), which granted absolute immunity to prosecutors. In *Doe*, the plaintiff, who was already incarcerated on an unrelated drug conviction, was held beyond her date of release pursuant to instruction from a court employee in accordance with a witness warrant. The court reasoned:

> This circuit has held (in an unpublished opinion) that detaining a witness in order to compel testimony at trial is prosecutorial and that any lawsuits arising out of a prosecutor's performance of this function are barred. *Harris v. Dallas Cty. Dist. Att'y's Office*, 196 F.3d 1256, 1999 WL 800003 (5th Cir. Sept. 14, 1999) (unpublished table decision).
>
> In *Harris*, we held that "efforts to secure the appearance of the state's trial witnesses in court are activities intimately associated with the judicial phase of the criminal process, and thus are entitled to absolute prosecutorial immunity." *Id.* at *1. This is so even where the prosecutor "acted inappropriately." *Id.* We find the reasoning of the *Harris* panel persuasive: the appearance of witnesses for trial is intimately associated with a prosecutor's advocacy. At times, the detention of witnesses is necessary to secure that appearance.

*Id*. at 548.

15

*Doe* distinguished *Schneyder*, noting:

> [I]t should have been apparent to the *Schneyder* defendants that their continuing detention of plaintiff was contrary to the court's wishes. Here, a court employee had specifically instructed the Deputy Sheriff to continue to detain Doe past her release date. The prosecutors therefore had reason to believe that *releasing* Doe would be contrary to the court's wishes.

*Id*. at 549. (emphasis in original).

The Court turns a fact-sensitive eye to Alfred's case. Alfred identifies two instances of prosecutorial misconduct: 1) providing falsehoods and material omissions in the motion for witness arrest warrant, and 2) failure to comply with Judge Hamilton's February 27, 2023 order.

**A. <u>Claims based on the motion for witness arrest warrant.</u>**

As evidenced by Alfred's relatively brief argument in opposition to Defendants' motion based on ADA Charrier's motion for witness arrest warrant (see Rec. Doc. 30, p. 23-24), Defendants' alleged conduct in this regard is easily shielded by *Doe v. Harris Cnty. Tx* and *Harris, supra*. Alfred argues that prosecutors do not enjoy immunity when acting as witnesses attesting to facts; however, Fifth Circuit precedent dictates a finding that ADA Charrier is immune from claims based on her averments in the motion for witness arrest. See also *Adams v. Hanson*, 656 F.3d 397, 405 (6th Cir. 2011) (applying absolute immunity to a prosecutor who allegedly provided false information in a material-witness arrest warrant); and *Simon v. City*

*of New York*, 727 F.3d 167, 172 (2d Cir. 2013) ("[W]hen a prosecutor seeks a material witness warrant, he does so as an advocate and is immune from suit, [such that] [a]ny alleged misstatements by [the prosecutor] in his application for the material witness warrant therefore cannot form the basis for liability."). For the same reason, Defendants are immune from claims based on ADA Charrier's statements at the September 6, 2023 hearing and objections to Alfred's release, as such conduct was prosecutorial in function.

Defendants devote the bulk of their arguments to justifying immunity on these grounds. In addition to leaning heavily on *Doe*, Defendants cite *Safar v. Tingle*, 859 F.3d 241 (4th Cir. 2017) and *Hart v. Hodges*, 587 F.3d 1288 (11th Cir. 2009). *Safar* granted immunity to a prosecutor who mistakenly failed to recall an erroneous arrest warrant. *Safar*, 859 F.3d at 250. *Hart* granted immunity to a prosecutor who allegedly improperly caused warrants to be issued. *Hart*, 587 F.3d at 1297. Both *Safar* and *Hart* concern the issuance (and, relatedly, the recall) of warrants, which is in accord with *Doe, supra*. Neither *Doe*, *Safar,* nor *Hart* addresses a prosecutor's conduct *unrelated* to the actual issuance or merits of a witness arrest warrant, which is the more troubling of Plaintiffs' claims.

## B. Claims based on Defendants' conduct after the February 27, 2023 order.

Alfred next argues that DA Duhe and ADA Charrier cannot be immune for their conduct after Judge Hamilton issued the February 27, 2023 order stating that

Alfred "be held without bond until the district attorney can speak to her, and notify the court what arrangement has been made." (Rec. Doc. 6-2). She alleges that, contrary to the order, Defendants did not contact her in anyway, resulting in her incarceration for six months until the JohnLewis trial finally went forward. The gross administrative failures condemned in *Odd* and *Schneyder* squarely encompass Defendants' alleged failures to make arrangements with Alfred or to take any steps to prevent an innocent witness's prolonged and unreasonable detention. See also *Kassa v. Fulton Cnty., Georgia*, 40 F.4th 1289, 1293 (11th Cir. 2022) (relying on *Odd* and concluding that absolute immunity did not protect an assistant district attorney who failed to cancel a witness arrest warrant). Compare *Adams*, 656 F.3d at 405 (contrasting the facts from *Odd* and granting immunity where the prosecutor's actions "occurred while seeking the witness's detention, not after the detention had commenced, and [the plaintiff] ha[d] not alleged that [the prosecutor] defied the court's instructions."). [4]

---

[4] Alfred also relies on *Simon v. City of N.Y., supra*, wherein the Second Circuit denied immunity for the detained witness's claims arising out of the prosecutor's out-of-court detention of her for two days of interrogation. *Id*. at 172-74. *Simon* is distinguishable. The Second Circuit denied immunity based on the prosecutor's investigatory function. Likewise, the Fifth Circuit in *Singleton, supra*, denied prosecutorial immunity to prosecutors who, in exercise of an investigatory function, issued fake subpoenas to witnesses to compel their interrogations. In Alfred's case, the Court classifies Defendants' alleged failures after the February 27 order as administrative, rather than investigative, thereby aligning the case with *Odd* and *Schneyder*.

Defendants attempt to minimize Judge Hamilton's February 27, 2023 order by relying upon Judge Thibodeaux's subsequent ruling at the September 6, 2023 hearing and the Louisiana Third Circuit Court of Appeal ruling seemingly affirming same. The Court is not persuaded. By that time, Alfred had been allegedly detained for over five months without the opportunity for appointment of counsel, the opportunity for bail, and other process before she was finally given, upon her own motion, an opportunity to challenge her detention.

Initially, the Court notes that on September 22, 2023, the Louisiana Third Circuit denied Alfred's writ application "on the showing made" and without prejudice "based on [a] scant record," noting that many of the exhibits and Alfred's constitutional argument were not initially presented to the trial court and therefore could not be considered on appeal. The Third Circuit permitted Alfred another opportunity to renew her request for bond, special conditions, and statutory rights if the criminal trial was again delayed. (Rec. Doc. 36-3). Alfred testified at the trial seven days later and was released, foregoing the need to renew her appeal. The Louisiana Third Circuit's ruling is inconsequential.

Additionally, Judge Thibodeaux's September 6, 2023 ruling does not support Defendants' position. That ruling addressed the *issuance* (i.e. the merits) of the witness arrest warrant and ultimately denied bail, bond, or release. (Rec. Doc. 28-2, p. 16-17). The crux of Alfred's claims is not the merits of the ruling (though she

19

rightfully disagrees with it). Rather, Alfred challenges Defendants' conduct—or lack thereof—in the more than five months she was held without the opportunity to even challenge her incarceration. Indeed, the prosecutor's obligation pertaining to a material witness is, as at least one court has recognized, a constitutional duty, independent of a court's order.

> Even were we to accept [the prosecutor's] interpretation of the evidence…her argument is mistaken in its dependence on the *Odd* panel's references to the alleged order as the source of an administrative duty. While the order was a relevant and supporting consideration, it was not determinative of the court's conclusion. …[T]he duty being enforced in this lawsuit arises from the Constitution, not from the authority of a state judge's order.

*Schneyder* 653 F.3d at 333.

Insofar as Defendants caused the warrant to be issued, caused Alfred to be arrested, caused her to be incarcerated, and (much) later opposed her release on bond, bail, or otherwise, Defendants are immune. Such conduct is intimately associated with prosecutorial duties. That Defendants allegedly allowed Alfred, an innocent witness, to remain in jail for six months without the chance to defend herself and without the most basic rights given even to accused criminals, is not. Had Defendants spoken to her and made any arrangement to secure her appearance at trial, as the Court interprets the February 27 order at this stage, Alfred could, at the very least, have had a chance to defend herself. The fact that she ultimately did— six months later, and as a result of her own actions—is irrelevant. Defendants

20

speculate that even if the September 6, 2023 hearing had happened earlier, they "woulda" made the same argument, and the court "woulda" reached the same conclusion. But Defendants fail to acknowledge that, had Alfred been given an earlier opportunity, Judge Hamilton, or even a different, unrelated, judge, "coulda" considered Alfred's position and released her weeks or months before she was deprived of her liberty. Defendants' "woulda, coulda, shoulda" argument is without merit. Hence, the Court finds that absolute immunity does not shield DA Duhe and ADA Charrier from Alfred's claims insofar as her claims are based on Defendants' alleged failures to take any action after Judge Hamilton's February 27 order.

## III.    Whether Qualified Immunity protects Defendants individually.

Having found that absolute immunity does not shield DA Duhe and ADA Charrier individually, the Court turns to their qualified immunity defense. Prosecutors receive qualified immunity only when performing "administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." *Buckley,* 509 U.S. at 273. Defendants did not meaningfully argue for dismissal on qualified immunity grounds. See Rec. Doc. 28-1, p. 36-37, wherein Defendants "out of an abundance of caution, [assert] that the doctrine of qualified immunity would also be applicable." Regardless, the Court declines to dismiss on the grounds of qualified immunity. The Fifth Circuit summarized qualified immunity law as follows:

The doctrine of qualified immunity protects public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. We undertake a two-pronged analysis to determine whether a government official is entitled to qualified immunity, inquiring: (1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct.

Courts exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first. A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

When confronted with a qualified-immunity defense at the pleadings stage, the plaintiff must plead facts which, if proved, would defeat the claim of immunity. The pleading standards remain the same when a motion to dismiss is based on qualified immunity. The crucial question is whether the complaint pleads facts that, if true, would permit the inference that Defendants are liable under § 1983, and would overcome their qualified immunity defense. At the motion to dismiss stage, it is the plaintiff's burden to demonstrate that qualified immunity is inappropriate.

*Guerra v. Castillo*, 82 F.4th 278, 285 (5th Cir. 2023) (cleaned up).

Again, the Court finds *Schneyder* instructive. In its detailed discussion regarding denial of qualified immunity for the prosecutor, the Third Circuit reasoned:

Although we are aware of no decision predating Smith's [the prosecutor's] actions that involved the sort of claim that Schneyder has

raised here, we are nevertheless convinced that this is one of those exceedingly rare cases in which the existence of the plaintiff's constitutional right is so manifest that it is clearly established by broad rules and general principles. That is, this ought to have been a member of that class of "easiest cases" that, according to Judge Posner, "don't even arise." ... *Redding,* 129 S.Ct. at 2643. One of the "point[s] of the Fourth Amendment" is to require that decisions involving citizens' security from searches and seizures be made wherever practicable by a "neutral and detached magistrate" rather than by a police officer or prosecutor possessed of a natural bias towards uncovering crime and obtaining convictions. *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Thus the Court has established that a criminal suspect is entitled to a prompt judicial determination that his arrest and detention is justified by probable cause. *Cnty. of Riverside v. McLaughlin,* 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991); *Gerstein,* 420 U.S. at 124–25, 95 S.Ct. 854. And numerous courts have reached the almost tautological conclusion that an individual in custody has a constitutional right to be released from confinement "after it was or should have been known that the detainee was entitled to release." *Cannon v. Macon Cnty.,* 1 F.3d 1558, 1563 (11th Cir.1993); *see also Fairley v. Luman,* 281 F.3d 913, 917–18 (9th Cir.2002); *Armstrong v. Squadrito,* 152 F.3d 564, 573–76 (7th Cir.1998); *Gray v. Cuyahoga Cnty. Sheriff's Dep't,* 150 F.3d 579, 582–83 (6th Cir.1998); *Sanders v. English,* 950 F.2d 1152, 1162 (5th Cir.1992); *cf. Baker v. McCollan,* 443 U.S. 137, 144–45, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (assuming that "mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty ... without due process of law' "). It should have required little thought about these cases, in light of background knowledge of the operation of the Bill of Rights within the justice system, to have given a reasonable prosecutor "fair warning" that she had a duty to ensure that the incarceration of an innocent person was at all times approved by a judicial officer.

*Schneyder*, 653 F.3d at 330–31.

This Court agrees that the obvious constitutional problems of incarcerating an innocent witness for an extended period of time without access to counsel, the

opportunity for bail or bond, or the opportunity to defend herself defeats qualified immunity at this stage of the proceedings. An attorney—one who is trained in the law and perhaps more familiar with constitutional rights than any other profession— needs neither precedent nor court order instructing him or her not to violate a person's due process rights.

### IV.    Whether DA Duhe, in his official capacity, is protected by Eleventh Amendment immunity.

DA Duhe seeks dismissal of Alfred's claims against him in his official capacity on the grounds of Eleventh Amendment immunity, which shields state actors from civil liability in federal court.[5] Official capacity suits against district attorneys are generally regarded as suits against the local government entity. *Hudson v. City of New Orleans*, 174 F.3d 677, 680 (5th Cir. 1999).

The Fifth Circuit has held that Louisiana prosecutors are local government officials, as opposed to state officials, and are thus not entitled to sovereign immunity. *Singleton,* 956 F.3d at 778, citing *Burge v. Par. of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) ("The rule in this circuit is that a Louisiana district attorney, sued in his or her official capacity, is a local government official who is not entitled

---

[5]    DA Duhe also urges dismissal of official capacity claims on the grounds of absolute immunity. The doctrine of absolute immunity does not apply to official capacity claims. *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.,* 229 F.3d 478, 483 (5th Cir. 2000). Defendants acknowledge as much but urge the Court to instead adopt the approach taken by an unpublished District of Massachusetts case. This Court is bound by the Fifth Circuit and declines to upset precedent absent a tenable argument to do so.

to Eleventh Amendment immunity."); *Spikes v. Phelps*, 131 F. App'x 47, 49 (5th Cir. 2005). While acknowledging that *Burge* appears to foreclose his position, DA Duhe advocates for a break from precedent. DA Duhe urges the Court to instead follow *Esteves v. Brock*, 106 F.3d 674, fn.8 (5th Cir. 1997), in which the Fifth Circuit held that a Texas district attorney was entitled to immunity insofar as she was acting on behalf of the state when exercising peremptory challenges. In *Spikes*, the court justified the differential treatment of Louisiana district attorneys in that case and Texas district attorneys in *Esteves* based upon "interpretation of Texas law concerning the role of a district attorney within the framework of state government." *Spikes*, 131 Fed.Appx. at 49. DA Duhe posits that Louisiana and Texas law do not differ regarding the role of a district attorney vis-à-vis state government, but the issue is not so simple.

Fifth Circuit precedent has created a complex landscape for adjudicating claims against district attorneys, beginning in 1985 with *Crane v. Texas*, 766 F.2d 193, 194-95 (5th Cir. 1985). The court examined Texas laws pertaining to the office of the district attorney, finding the position had both state and local attributes. In considering a district attorney policy regarding misdemeanors, the court found the district attorney's policies held greater weight for the county, rather than the state, such that the local government could be civilly liable for constitutional violations caused by the policy. *Id*. Importantly, *Crane* was not an Eleventh Amendment

immunity case. Nevertheless, *Esteves* later found that the Texas district attorney's actions in that case (exercise of peremptory challenges) were state-based and thus entitled to Eleventh Amendment immunity. *Esteves,* 106 F.3d at fn. 8.

In the meantime, pre-*Esteves*, the Fifth Circuit decided *Mairena v. Foti*, which aligned Louisiana district attorneys with Texas district attorneys under the *Crane* analysis. *Mairena v. Foti*, 816 F.2d 1061, 1064, fn. 1 (5th Cir. 1987). The court reasoned, in a footnote that, like Texas district attorneys, Louisiana district attorneys were local actors and, the Court concluded, were thus not entitled to Eleventh Amendment immunity. *Id*. Subsequent opinions, *Spikes* and *Burge*, relied on *Mairena* in holding that Louisiana district attorneys were not immunized by the Eleventh Amendment. *Spikes*, 131 F. App'x at 49 (5th Cir. 2005), citing *Burge,* 187 F.3d at 467–68; *Burge*,187 F.3d at 466. Further complicating matters is *Chrissy v. Mississippi Dept. of Public Welfare*, in which the Fifth Circuit held that Mississippi district attorneys were entitled to state immunity, because the Mississippi district attorney's office was state-funded, and the district attorney was authorized to address statewide concerns. *Chrissy F. by Medley v. Mississippi Dept. of Public Welfare*, 925 844, 849 (5th Cir. 1991).

The reasoning behind the divergence of opinions as between Louisiana, Texas, and Mississippi district attorneys is not readily understood without a thorough reading of *Hudson v. City of New Orleans*, in which the Fifth Circuit undertook a

sweeping analysis of Louisiana law in order to "clarify why the Eleventh Amendment does not immunize the Orleans Parish District Attorney's office." *Hudson*, 174 F.3d at 681. In *Hudson*, the court carefully examined constitutional and legislative aspects of the New Orleans District Attorney's office pursuant to the Fifth Circuit's six-factor test enunciated in *Clark v. Tarrant County* for determining whether a government entity is entitled to immunity:

1. Whether the state statutes and case law view the agency as an arm of the state;

2. The source of the entity's funding;

3. The entity's degree of local autonomy;

4. Whether the entity is concerned primarily with local as opposed to statewide problems;

5. Whether the entity has the authority to sue and be sued in its own name; and

6. Whether the entity has the right to hold and use property.

*Id.*, citing *Clark v. Tarrant County,* 798 F.2d 736, 744–45 (5th Cir.1986).

After examining relevant Louisiana law and evidence adduced at the district court's hearing, the court found the first factor to be neutral in that state law considered district attorneys as officers of the state, yet also considered them as part of local government (much like Texas district attorneys discussed in *Crane*). *Hudson*, 174 F.3d at 686. The court emphasized that the second factor—source of funding—should be afforded the most weight, because the ultimate inquiry is whether a judgment against the district attorney would be paid with state funds. *Id.*

27

at 687-88.[6] After a detailed discussion of Louisiana statutes and evidence regarding funding of the New Orleans district attorney's office, the court concluded that New Orleans would be responsible for payment of any judgment awarded in the §1983 suit. *Id*. at 689. This conclusion proved decisive, with the court noting, "If we cannot say that the Orleans Parish District Attorney's office is the 'alter ego' of the state, we cannot provide it with the protections of the Eleventh Amendment." *Id*. In this case, Defendants conceded at the hearing that funding for the district attorney remains as it was at the time of *Hudson*. See also La. R.S. 13:5108.1, providing that the state is obligated to defend and indemnify "covered individuals," the definition of which explicitly excludes district attorneys. La. R.S. 13:5108.1(E)(3).

The third factor tilted slightly towards Eleventh Amendment immunity due to a certain degree of state oversight authorized by the Louisiana constitution. *Id*. at 690. The fourth factor weighed against immunity, because the district attorney's office was primarily concerned with local problems. *Id*. at 690-91. The fifth and sixth factors, regarding the district attorney's office's capacity to sue and be sued and its right to hold and use property, had little effect on the conclusion. *Id*. at 691.

---

[6]     This factor explains why *Chrissy* found Eleventh Immunity: Mississippi district attorneys were state-funded, and the plaintiff provided no evidence to prove otherwise. See discussion in *Hudson*, 174 F.3d at 682.

*Hudson* did not ignore the earlier *Esteves* opinion, but, rather, briefly addressed it in a footnote to its threshold citation to *Clark*. *Id*. at 681, fn. 1. There, the court explained that the district attorney's function (i.e. whether he acted on behalf of the state or the local entity) is only to be considered in the context of §1983 county liability (as was the case in *Esteves*) but is not to be considered in the Eleventh Amendment context (as was the case in *Crane*). *Id*. The Fifth Circuit re-affirmed this distinction in *Daves v. Dallas Cnty., Texas*, 22 F.4th 522, 533–34 (5th Cir. 2022), a case which DA Duhe cites as authority for the Court to reconsider the status of Louisiana district attorneys. DA Duhe likewise cites *Arnone v. Cnty. of Dallas Cnty., Texas*, 29 F.4th 262, 272 (5th Cir. 2022) in support of his argument for reconsideration; however, *Arnone*, like *Daves*, was in the context of §1983 county-liability. Neither *Arnone* nor *Daves* was a Louisiana Eleventh Amendment immunity case, and thus both are inapplicable to this argument. Other divisions within this Court have previously rejected Louisiana district attorneys' *Esteves* argument. See e.g. *Phillips v. Whittington*, 497 F. Supp. 3d 122, 153 (W.D. La. 2020); and *Darden v. Vines*, No. 6:22-CV-0404, 2023 WL 11830304, at *2 (W.D. La. Mar. 10, 2023), *report and recommendation adopted,* No. 6:22-CV-00404, 2023 WL 6178709 (W.D. La. Sept. 21, 2023), *appeal dismissed,* No. 23-30700, 2024 WL 1433633 (5th Cir. Feb. 16, 2024). Other courts have likewise refused to use *Arnone* and *Daves* to overrule *Burge*. See e.g. *Floyd v. Dillmann,* 659 F. Supp. 3d 724, 729 (E.D. La.

29

2023). Interestingly, the Fifth Circuit more recently indicated a willingness to ignore *Esteves*, in favor of *Crane*, and align Texas district attorneys with Louisiana district attorneys who do not enjoy Eleventh Amendment immunity. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 787 (5th Cir. 2024), citing *Hudson* ("Indeed, we have 'held that Texas district attorneys [are] not protected by the Eleventh Amendment' precisely because they are county officials, not state officials."). For the reasons set forth in *Hudson*, and as repeatedly held in the Fifth Circuit and Louisiana district courts, the Court finds that DA Duhe is not protected by the Eleventh Amendment.

## V. Whether Plaintiff has stated a *Monell* claim against DA Duhe in his official capacity.

Having found that DA Duhe, in his official capacity, is not protected by Eleventh Amendment immunity, the Court next considers whether Alfred has stated a claim against DA Duhe in his official capacity. Official capacity suits under §1983, are governed by the Supreme Court's decision in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). See *Burge*, 187 F.3d at 470-71. The Fifth Circuit summarized *Monell* municipal liability principles as follows:

> It is well established that a city is not liable under § 1983 on the theory of respondeat superior. A municipality is liable only for acts directly attributable to it through some official action or imprimatur. To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken pursuant to an official municipal policy. A plaintiff must identify: (1) an official policy (or custom), of which (2) a policymaker can be

charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom.

The existence of a policy can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority. A single decision by a policy maker may, under certain circumstances, constitute a policy for which a municipality may be liable. However, this single incident exception is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker.

Under the second prong, actual or constructive knowledge of a custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority. This circuit has long distinguished between final decisionmaking authority and final policymaking authority. A municipal policymaker is someone who has the responsibility for making law or setting policy in any given area of a local government's business. Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. Whether an official possesses final policymaking authority for purposes of municipal liability is a question of state and local law.

The third prong requires a plaintiff to prove "moving force" causation. To succeed, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights. That is, the plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. Deliberate indifference is a high standard—a showing of simple or even heightened negligence will not suffice.

*Valle v. City of Houston,* 613 F.3d 536, 541–42 (5th Cir. 2010) (cleaned up).

31

## A. <u>Policy Maker</u>

DA Duhe maintains that, under *Daves* and *Arnone*, *supra*, Alfred's allegations show that he was acting as a state actor, who cannot be held liable as a local actor under *Monell*. In *Arnone*, the Fifth Circuit explained that district attorneys are afflicted by a dual-hat problem:

> A policymaker is an official whose decisions represent the official policy of the local governmental unit. In other words, an official who has the power to make official policy on a particular issue. When he speaks on it, his words represent the local government's official policy.

> But sometimes a policymaker wears more than one hat. Again, only *county* policymakers count for liability under *Monell.* So what happens when an official sometimes acts for the county, and sometimes acts for another governmental entity, like the state? In those cases, we have to weigh state law and the policymaker's complained-of actions. Only then can we decide which entity is to blame.

*Arnone,* 29 F.4th at 266.

As discussed above and emphasized in *Daves*, the analysis to designate a policy maker for purposes of §1983 municipal liability differs from that of Eleventh Amendment immunity. In the Eleventh Amendment context the question comes down to one of funding: Who is responsible to pay the judgment? In Louisiana, the local entity pays, a fact Defendants' counsel confirmed at the hearing. In the *Monell* context, the question of whether a defendant is a local policy maker focuses on function. *Daves*, 22 F.4th at 533, citing the seminal case of *McMillian v. Monroe Cnty.*, 520 U.S. 781, 786, 117 S.Ct. 1734 (1997). "Courts must 'ask whether

32

governmental officials are final policymakers for the local government in a particular area, or on a particular issue.'" *Arnone*, 29 F.4th at 266, quoting *McMillian* at 786. "That inquiry turns on the official's 'actual function' under 'relevant *state* law[,]'" including the state constitution, statutes, and jurisprudence regarding duties and powers given to the actor. *Id*.

Again, *Burge* forecloses DA Duhe's reliance on *Daves* and *Arnone*. In *Burge*, the court conducted a *McMillian* analysis and held: "Considering the Louisiana constitutional and statutory law and tort cases, we conclude that, in a suit against a district attorney in his official capacity under §1983 for constitutional torts caused by the district attorney's policies regarding the acquisition, security, and disclosure of *Brady* material, a victory for the plaintiff imposes liability on the district attorney's office as an independent local entity." *Burge*, 187 F.3d at 471. Although DA Duhe urges the Court to consider *Daves*/*Arnone* as more contemporary cases, this Court is bound by *Burge* and its *McMillian* analysis of *Louisiana* district attorneys. See also *Kimble v. Jefferson Par. Sheriff's Off.,* No. 22-30078, 2023 WL 1793876, at *3 (5th Cir. Feb. 7, 2023) (unpublished); and *Floyd,* 659 F. Supp. 3d at 729.

DA Duhe did not present any argument that Louisiana law has changed since *Burge*, and this Court sees no reason to distinguish or depart from that precedent. Louisiana law still treats district attorneys as "virtually [] autonomous local

government official[s]." *Burge*, 187 F.3d at 469. See e.g. La. Const. art. 5, §26(B) ("[A] district attorney, or his designated assistant, shall have charge of every criminal prosecution by the state *in his district*, be the representative of the state before the grand jury *in his district*, and be the legal advisor to the grand jury.") (emphasis added). See also La. R.S. 16:1-925 setting forth numerous provisions regarding a district attorney's local position (e.g. salaries, fees, programs).

Finally, the Court is concerned about the implications of ignoring decades of sound Fifth Circuit jurisprudence treating Louisiana district attorneys as local policy makers. Having confirmed *Hudson*'s ruling that Iberia Parish would fund a judgment against DA Duhe, the Court is unwilling to hold that DA Duhe acted for the state in allegedly misusing the material witness statute. Otherwise, Iberia Parish could be forced to pay for the alleged transgressions of a state actor. Thus, although Eleventh Amendment immunity and *Monell* liability are distinct analyses, a finding of no Eleventh Amendment immunity rationally aligns with a finding that a district attorney is local policy maker. Accordingly, the Court declines to accept Defendants' stale argument. DA Duhe can be held liable in his official capacity as a local policy maker.

### B. <u>Constitutional Violation</u>

DA Duhe next argues that Alfred did not sufficiently allege a violation of her constitutional rights. Alfred alleged she was incarcerated for six months as an

34

innocent witness without the opportunities for counsel, bail, or to defend herself. She has more than adequately alleged constitutional violations of her Fourth and Fourteenth Amendment rights.

Nonetheless, DA Duhe argues Alfred, as a witness, did not have a right to counsel, citing *Cooks v. Rapides Par. Indigent Def. Bd.,* 96-811 (La. App. 3 Cir. 12/11/96), 686 So. 2d 63, 67, *writ denied,* 97-0409 (La. 3/27/97), 692 So. 2d 398. Compare *In re Class Action Application for Habeas Corpus on Behalf of All Material Witnesses in W. Dist. of Texas*, 612 F. Supp. 940, 947 (W.D. Tex. 1985), in which the court held that material witnesses were entitled to court-appointed counsel. The Court defers analysis on this issue until the constitutional issues of the material witness statute are fully briefed and before the Court for adjudication. Unresolved issues of right to counsel notwithstanding, Alfred has adequately pled a violation of her fundamental due process right to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902 (1976).

### C. **Official Policy**

DA Duhe next argues that Alfred did not sufficiently allege the existence of a policy or custom which was a moving force behind the alleged constitutional violations. The Fifth Circuit has established three ways of establishing municipal policy:

First, a plaintiff can show "written policy statements, ordinances, or regulations." Second, a plaintiff can show "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." Third, even a single decision may constitute municipal policy in "rare circumstances" when the official or entity possessing "final policymaking authority" for an action "performs the specific act that forms the basis of the § 1983 claim."

*Webb v. Town of Saint Joseph*, 925 F.3d 209, 214–15 (5th Cir. 2019) (citations omitted).

"A policy or custom is official only when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject matter of the offending policy." *Peterson v. City of Fort Worth, Tex.,* 588 F.3d 838, 847 (5th Cir. 2009). "Thus, a plaintiff must show the policy was promulgated by the municipality's policymaker." *Id*.

Alfred alleged that DA Duhe has a policy, practice, or custom of applying for material-witness arrest warrants without probable cause and without first determining whether it may become impracticable to secure the witnesses' appearance by trial subpoena, that this policy causes material witnesses to be unlawfully arrested and incarcerated for prolonged periods of time without adequate process. (Rec. Doc. 6, ¶265-68). DA Duhe contends that Alfred's allegations do not establish a pattern or practice sufficient to constitute an official policy. Alfred counters that her allegations show both a custom, pattern, or practice, and that, nonetheless, the single incident exception supports her claims of an official policy.

36

1. **Pattern or Practice**

      A pattern is tantamount to official policy when it is so common and well-settled as to constitute a custom that fairly represents municipal policy. Where prior incidents are used to prove a pattern, they must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees. It is thus clear that a plaintiff must demonstrate a pattern of abuses that transcends the error made in a single case. A pattern requires similarity and specificity[.] … A pattern also requires sufficiently numerous prior incidents, as opposed to isolated instances.

*Peterson*, 588 F.3d at 850–51.

In considering whether a series of prior incidents constitutes a pattern for *Monell* liability, the court should also consider the size of the office and the proportion of the number of violations (in this case, the number of prolonged detentions without process, or the number of misused witness arrest warrants, as Alfred frames it) to the number of acts (in this case, the number of witness arrests). *Id*. at 851-52.[7] Importantly, the other alleged instances should be substantially factually similar. In *Peterson*, the court found multiple distinctions among the prior instances of excessive force and concluded that twenty-seven complaints of excessive force over four years, without context as to the overall number of arrests

---

[7]    In *Peterson*, the court considered the number of instances of excessive force in proportion to the number of arrests, as well as the size of the police department.

or comparisons to other cities, was insufficient evidence of a pattern rising to the level of a policy. *Id*. at 852, fn. 4.

Alfred's complaint alleges that DA Duhe did not seek any material-witness arrest warrants in 2020, he sought and/or was granted three warrants in 2021, four in 2022, and one in 2023. (Rec. Doc. 6, p. 27, fn. 5). She alleges she sought details regarding past material-witness arrest warrants, but that the DA had not yet provided the information. (Rec. Doc. 6, p. 28, fn. 6). She specifically alleges eight other alleged incidents of unlawful material witness arrests and incarceration, including four related to the JohnLewis/Layne trials. She alleges that each witness was detained as a material witness without an opportunity for counsel, adequate process, or the opportunity to post bond. (Rec. Doc. 6, ¶270-306). Alfred argues that her allegations show that Defendants misused the material witness statute every time the statute was invoked, translating to a proportion of eight out of eight, or 100%. Pursuant to *Peterson*'s guidance regarding the parameters for establishing pattern, and taking all allegations as true, the Court agrees that Alfred's allegations sufficiently show a pattern.

## 2.  Single Incident/Direct Violation

Alfred contends that the single incident exception supports her *Monell* claim against DA Duhe, because DA Duhe was personally involved in violating her constitutional rights. The Fifth Circuit recognizes a single incident exception,

particularly in failure to train cases, whereby, in rare cases, "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 563 U.S. 51, 64, 131 S. Ct. 1350 (2011). See also *Brown v. Bryan Cnty., OK,* 219 F.3d 450 (5th Cir. 2000). Alfred has not alleged a failure to train.

Semantics notwithstanding, Alfred's argument is persuasive. "An unconstitutional policy may be found when a policymaker performs the specific act that forms the basis of the § 1983 claim." *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 395 (5th Cir. 2017), *as revised* (Mar. 31, 2017), citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 482, 484–85, 106 S.Ct. 1292 (1986)); *see also Anderson v. City of McComb*, 539 F. App'x 385, 388 n.2 (5th Cir. 2013) ("When the policymakers are the violators, no further proof of municipal policy or custom is required."). Alfred alleges that DA Duhe was personally involved in her arrest. (Rec. Doc. 6, ¶82, alleging that Garon Lewis's father met with DA Due and ADA Charrier and demanded that they do more in their prosecution; ¶83-125, alleging that Defendants, collectively, attempted to serve her with a subpoena, and when that failed, had her arrested on a material arrest warrant. DA Duhe is identified on the signature block of the motion for arrest. (Rec. Doc. 6-1). The February 27 order directs "the District Attorney" to speak with Alfred and notify the court of

arrangement. (Rec. Doc. 6-2). Hence, Alfred's allegations also support a claim for *Monell* liability based on DA Duhe's alleged personal involvement.

## VI.    Alfred's Standing for Declaratory and Injunctive Relief

Defendants seek to dismiss Alfred's claims for declaratory and injunctive relief for lack of standing. Alfred seeks declaratory and injunctive relief from Defendants' alleged threats to re-incarcerate her until the Layne trial, now continued beyond September 2024. Standing is determined based on the concreteness of a future alleged injury, as the Fifth Circuit explained:

> To have Article III standing, a plaintiff must show an injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by the plaintiff's requested relief. Courts have divided this rule into three components: injury in fact, causation, and redressability. The party seeking to invoke federal jurisdiction, in this case the Plaintiffs, bears the burden of establishing all three elements.

> Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements. The redressability requirement limits the relief that a plaintiff may seek to that which is likely to remedy the plaintiff's alleged injuries. Because injunctive and declaratory relief "cannot conceivably remedy any past wrong," plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury. That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact. To be an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'" The purpose of the requirement that the injury be "imminent" is "to ensure that the alleged injury is not too speculative for Article III purposes." For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur.

40

*Stringer v. Whitley*, 942 F.3d 715, 720–21 (5th Cir. 2019) (citations omitted).

Defendants argue Alfred lacks the requisite standing, because she alleges that she will comply with the subpoena for that trial, such that the possibility of her arrest is speculative. The Court disagrees. Alfred alleges that she previously attempted to comply with the subpoena for the Layne trial but was nonetheless threatened with incarceration. (Rec. Doc. 6, ¶231-45). The fact that she intends to comply with the subpoena does not, based on her allegations, render the threat of incarceration any less likely. Thus, the Court finds that Alfred has stated a claim for declaratory and injunctive relief.

## VII. <u>Alfred's Claim for Reputational Damage Stands.</u>

Defendants move to dismiss Alfred's claim for damages resulting from harm to her reputation. The Court disagrees with defendants' arguments for dismissal of this claim.

> Allegations of damage to one's reputation or the impairment of future employment prospects fail to state a claim of denial of a constitutional right. However, damage to an individual's reputation as a result of defamatory statements made by a state actor, accompanied by an infringement of some other interest, is actionable under § 1983. This is known as the "stigma-plus-infringement" test.

*Ristow v. Hansen*, 719 F. App'x 359, 365–66 (5th Cir. 2018) (unpublished), quoting *State of Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995).

See also *Marrero v. City of Hialeah*, 625 F.2d 499, 513–14 (5th Cir. 1980) (Because "the injury to reputation is simply an element of the damages suffered as a result of the violation of appellants' fourth amendment rights[,] damages for injury to reputation caused by [an] unlawful search and seizure are recoverable.").

Alfred alleges that she suffered Fourth and Fourteenth Amendment violations. Reputational harm is recoverable as an element of damages. The plaintiffs in the cases on which Defendants rely, *Siegert v. Gilley*, 500 U.S. 226, 234, 111 S. Ct. 1789, 1794 (1991) and *Vander Zee v. Reno*, 73 F.3d 1365, 1370 (5th Cir. 1996), did not satisfy the stigma-plus test and are inapplicable. Defendants' motion to dismiss should be denied in this regard.

**VIII.   Alfred's Claim for Negligent Infliction of Emotional Distress Stands.**

Defendants last seek to dismiss Alfred's claims for Negligent Infliction of Emotional Distress (NIED). "[NIED] is a state common law tort." *Grandstaff v. City of Borger, Tex.,* 767 F.2d 161, 172 (5th Cir. 1985). "Section 1983 imposes liability for violation of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Id*., quoting *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695–96 (1979).

Louisiana law does not recognize an independent cause of action for NIED. Rather the claim is derivative of other claims. *Phillips v. L. Brands Serv. Co., L.L.C.,*

82 F.4th 291, 303 (5th Cir. 2023). The Louisiana Supreme Court recently provided

the following analysis for NIED claims:

> A claim for [NIED] without physical injury is viable under La.Civ.Code art. 2315(A), which provides: "Every act whatever of man that causes damages to another obliges him by whose fault it happened to repair it." A duty-risk analysis is utilized in determining whether one may recover under La.Civ.Code art. 2315. For liability to attach, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element). A negative answer to any of those inquiries results in a determination of no liability.

> Additionally, for negligent infliction of emotional distress claims absent physical damage/injury, a plaintiff must prove "the especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." This rule must be "stringently applied" in cases that are inherently speculative in nature. The actions of the defendant must constitute negligence. The plaintiff's mental disturbance must be "serious." Evidence of generalized fear or evidence of mere inconvenience is insufficient. Evidence of medical treatment is not required, nor is expert medical testimony; however, a plaintiff bears the burden of presenting sufficient evidence of the nature and extent of the mental anguish suffered that was caused by the defendant's conduct. Whether the mental distress is "serious" is a matter of proof.

*Spencer v. Valero Ref. Meraux, L.L.C.*, 2022-00469 (La. 1/27/23), 356 So. 3d 936,

950 (citations omitted).

A successful NIED claim does *not* require the existence of a special, direct duty owed by the defendant, outrageous conduct on the part of a defendant, or a showing that the emotional distress suffered by a plaintiff was reasonably foreseeable or severe and debilitating. *Id.*

Defendants maintain Alfred's allegations do not support the imposition of a duty. They attempt to justify their alleged conduct based on the September 6, 2023 order, which they argue dissolved any duty they might have had under the February 27, 2023 order. Indeed, if the September 6 order voided the February 27 order, as Defendants argue, Defendants lacked any authority to incarcerate Alfred from the outset.

Alfred alleges that, when Defendants utilized the material witness statute to confiscate her freedom, they were duty-bound to ensure her constitutional rights were protected, regardless of a court order to do so. The Court agrees. The February 27, 2023 court order merely manifested that duty. Alfred's detailed allegations satisfy Rule 12(b)(6) standards. Defendants' NIED argument suffers the same fate as the others.

## Conclusion

For the reasons discussed herein, the Court recommends that Defendants' Motion to Dismiss (Rec. Doc. 28) be DENIED.

44

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. §636(b)(1).

THUS DONE in Chambers, Lafayette, Louisiana on this 28th day of August, 2024.

_____
CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE